We'll proceed to the last case scheduled for argument today, Aikens v. Portfolio Recovery Associates. Aikens v. Portfolio Recovery Associates May it please the Court. My name is David McDevitt. I'm with the Thompson Consumer Law Group. I represent Sharon Aikens, the appellant in this case, in her appeal of the District Court's order, which dismissed with prejudice her action against the appellee, Portfolio Recovery Associates, LLC, on the basis that she lacks standing under Article III to bring her claim. The entire case really can be resolved in reverse for one very simple reason, and that is that had Portfolio not taken money out of her account in violation of the EFTA's provisions, she would have more money in her account than she does today. And that is to say that without authorization that the EFTA required, Portfolio wasn't allowed to take money out of her account. What it did, in violation of the statute, she has less money, and that's a tangible injury. The tape shows that she agreed to the payment. There was a lengthy discussion and there was no confusion about the amount. She gave her bank a routing number and agreed to a certain payment plan based on hardship and so on. And while it's true that the statute requires a written authorization to be provided at the time, your complaint is devoid of allegations of risks that she ran or damage suffered that was the kind of damage that the statute was intended to preclude. And I didn't see any evidence offered in the 12B1 hearing as well about risks that she ran or damage that she accrued. Is there anything other than the orally authorized withdrawal of money that you can point to as the kind of harm that the statute was intended to prevent? So first, Struble says that there's not a need for ensuing adverse consequences. It's sufficient that the defendant does something that the statute said you're not allowed to do. And if two things are met, one, Congress conferred a procedural right to protect a plaintiff's concrete interest, and two, the procedure violation represents a risk of real harm to that concrete interest. Here, the concrete interest is not having money taken out of your account under a recurring preauthorized auto-debit arrangement unless you really want that money to come out of your account. And there are many ways in which you can end up having money come out of your account when you didn't want to. In the audio recording, she says, first they ask her. Did she ever attempt to revoke the authorization that she gave? No, she didn't. And if she had received a copy of her written authorization at the time that she entered into the authorization, as the statute requires, there is a better chance that she would have been able to revoke it. She was able to revoke it. She just didn't get the writing until nine days later, right? Well, so they might have mailed her something. I mean, there's no evidence in the record that she received what they mailed her. But they mailed her something. But at that point, the consumer has forgotten about it, right? The point of the statute is that it confers an individual consumer right to receive a copy of the authorization that you've just entered into. Because if you listen to the audio recording, first they say, can you do it? She says, no. No, I'm on disability. No, I haven't done my bills for next month. No, I'm not really under, you know, I just woke up. I have a splitting headache. I'm on disability. I'm a little, you know, she says, I'm still trying to get myself together. I think she really thought that she would get a letter in the mail and that she could call this lady up and say, go ahead and run it this month because, you know, I do have the money. I want this 12-month plan. I intend to pay it, you know. But if she had had a written authorization, should they have required her to sign it, she would have had to look at what she was actually agreeing to as opposed to just saying yes in response to a very persuasive collection sales agent. Isn't that really the problem? I sort of see this as more a Fair Debt Collection Procedures Act case in a sense, that what you're really saying is she didn't want to pay the debt or she didn't want this whole thing to happen and she's being pressured to agree to something that maybe she wouldn't have agreed to otherwise or if she had the writing, she might not have agreed to it. But is that what Congress was concerned with in this particular statute? Yes, it is. So Congress wanted to make sure that in enacting the in-writing requirement and the copy being given to the consumer that it would minimize any misunderstandings. It's possible. There isn't any misunderstanding, is there? I mean, there's no evidence of any misunderstanding. You know, I sort of first looked at this as something like the, you know, whatever, the aluminum siding acts and things like that that exist in some states where if you agree to certain kinds of home improvements, you have a mandatory waiting period where you can change your mind. But I didn't see anything in this statute or in its legislative history that suggested that the goal was to give people an opportunity to change their mind about something they'd already agreed to as opposed to just understanding the terms. The point is you're agreeing to something that's recurring and people need to really understand that. Right. So the very next sentence in the statute that she brought a claim under, 1693 E, subsection A, says a preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing and a copy of such authorization shall be provided to the consumer when made, period. A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. So the very next sentence in that statute makes clear that Congress was concerned about the consumer's ability to prevent money from coming from out of their account when they didn't actually want it to come out of their account, even if they previously said, yes, I did. And there's another section. But also even if they got the writing, right, and even if the procedure had started, doesn't that provision that you just quoted mean that they can stop it at any time? Absolutely, yes. Is there any evidence that she did stop it at any time? There's not evidence in the record that she attempted to stop it. But how is she supposed to stop it if she doesn't get a copy at the time she makes the authorization? I guess there was evidence that she was sent a written authorization, a copy of it. And I'm just concerned that, you know, I underspoke you. You need to show some kind of concrete, particularized, tangible injury. And had there been an allegation that she would have not authorized it because she didn't understand until she got the writing that there was a statute of limitations defense and she didn't have to and she would have, on reflection, weighed things differently and not given such weight to her improving her credit score or what have you or changed the date on which the withdrawal was made, that would be something. But I'm concerned that you have a hard time showing the kind of injury that we're required to look for for Article III standing based on the mere failure to obtain a written authorization or to establish that one was provided whatever at the time means. Well, I completely understand that concern. And I want to point out that in all the cases that talk about the, well, you know, I was confused or this is what happened to me as a result. Here's my harm. Here's my experience of that harm. Those make it sufficient for injury. And I wish we had pleaded more. But we weren't required to. Spokia says very clearly and Struble, this Court's opinion, says very clearly in cases where Congress enacts a procedural statute where there are intangible injuries that are difficult to prove, hard to establish, how can she really prove I wouldn't have signed it had I seen it in writing? Nobody can really prove that. You can't, you know, go back in time. So Congress understands these things. You don't really even allege that she ran a particular risk or she was subject to a risk even if nothing bad ever came to fruition. What risk was she running? What engagement does she have with the statute here? Well, it's the risk that there's, so that Congress preferred, that the procedural violation represents a real risk, a risk of real harm to that interest. And that's true in the abstract. In Katz v. Donna Karan, the Court addressed how does the Court decide whether or not a violation runs a real risk of concrete harm. All you've pointed to is that they withdrew the money that she authorized them to withdraw. Well, it makes it more subject to fraud. It makes it more subject that the person that is then initiating the authorization, the payee, takes out what they said out of context. If it's in writing, then, you know, the consumer has a copy of it, first of all. And also — But she has a copy of it. Well, she doesn't have a copy. It's not in the record that she has a copy of it. It's in the record that they mailed her a document with terms. But they didn't mail her her authorization. This is meant to minimize misunderstandings. If she had a copy of the document that she actually signed — Do you think in the record is there any testimony that she did not receive it? This was dismissed on a 12B1 motion. I thought there was an evidentiary proceeding regarding the 12B1 motion. No, Your Honor. This was submitted on the motions. There was an audio — A representation? So the defendant just made a representation that a mailing had occurred? Correct. Is there jurisdiction in a state court to pursue a claim of this nature? Your Honor, I will say that in Katz v. Donna Karan, the Court clarified that any dismissal would have to be without prejudice in a circumstance like this. I'm not sure whether there would be, and I don't think it would be up to this Court to make that decision. Well, no, it wouldn't be up to us to make a decision. That's not — my question is to — it's my view, and maybe we'll hear otherwise from the other side. But until a hearing to the contrary from the other side and considering any argument, I would think the dismissal should be without prejudice. That's not my question. My question is if it is dismissed without prejudice, is there somewhere else that the claim could be pursued? So that might mean — question one is, is there anything in the statute that says the jurisdiction of the federal courts is exclusive with respect to claims under the EFTA? And then secondly, the next question might be, and this was more speculative, not every state has this traditionally invented case or controversy requirement of the nature that the federal courts have. And there may be state courts that would say, we don't have this stringent-to-standing requirement for jurisdiction of our courts. I understand. I guarantee that in any state, if you bring this in a state court, the defendant will remove it to federal court and then file a Spokio motion. I don't know. It's 1693M. I believe it's MG or MK. Maybe you can file it in the state where they are. And then, of course, this class-to-class action problem is the other thing you've got, right? Well, perhaps. But we're looking at a — we're looking at a violation of a clear statute that is meant to prevent a person's money from coming out of their account where money really did come out of their account. That's what I would have thought in Spokio. I would have thought that Spokio is — exactly the argument you're making is the argument I would have thought was persuasive were I deciding Spokio in the first instance. But the Supreme Court put a spoke in your wheel there. How so, Your Honor? Because, first, Spokio was simply remanded for the Ninth Circuit to make a more clear analysis. They didn't decide anything in Spokio. They had some dicta about saying an inaccurate zip code. You know, they can't see how that runs the risk of real harm. But in Spokio, he alleged that there was inaccurate information, but he didn't plausibly allege any harm had actually occurred to him. Here, my client has had money taken out of her account. Right, but you're referring to Scribble, which is our precedent interpreting Spokio. And it's interesting there that two of the claims failed on Spokio grounds because there was not, in the panel's view, a tangible risk of harm. So it's not as if Scribble says this is an easy thing to get over. Absolutely. But in Scribble, they opened an account, they gave her a document, and they said this document failed to contain disclosures. These disclosures were applicable to her. Even though she had no opportunity to use the disclosures, there was standing. The exact same thing has occurred here. Even though the record doesn't show that she ever wanted to revoke or to stop payment, even though the record doesn't show that she didn't plead, that she was actually confused. But Scribble focused on this language, that the procedural violation have to present a risk of real harm to a concrete interest. Right. It does present a risk of real harm. There's a greater risk of fraud. You've just talked about the risk as being related to the fact that they ended up withdrawing money from the account. You're saying just any withdrawal that's based on an oral representation presents a risk of fraud. It presents a risk of fraud, of unauthorized use, some sort of withdrawal that was not really what the consumer intended, that they could make a withdrawal for a higher amount. If the consumer sees everything in writing, if they're required to have it in writing, if the financial institution can demand to the payee, show me the authorization in writing, don't just tell me that they agreed to it verbally. And if the consumer gets a copy of it at the time, they can say, hang on, you put a There are risks by not putting things in writing. And Congress recognized that, and they said when these types of auto-debit payments are going to happen, we want the consumer to first have to agree to it in writing, second, get a copy of it. You say there's a violation of the statute here, and a plaintiff and any prospective member of the class needs to show nothing more than they gave the authorization without having a written interaction with the debt collector, and did not at the time of the authorization obtain a written copy of the agreement, I guess. Absolutely, because every single person who was signed up for auto-debits over the phone was not afforded the procedural protection that Congress wanted, that has to do with their interests and not having money come out of their account when they don't really want it to, and that includes if they change their mind in the future. And every single one of them had an authorization that occurred purely orally. So they absolutely all have a violation and all have standing for a claim. Do I misunderstand? I did not think you were asking for the money back. You're asking for statutory damages. Is that the case? Well, we pleaded actual damages. And I think the question of whether she has to show she wouldn't have signed the document if she'd seen it in writing, or whether it's sufficient the fact that they violated the statute and took her money anyway, whether she gets actual damages. I think those are both merits questions, and I think that's what will get decided in the first instance below. But I think at the very least that she is standing to seek statutory damages and that there was some harm here, and that at the very least she had an informational right to the copy. But there was some harm or there was a risk of harm? There was harm in that she didn't get the copy of the document. That runs the risk that she won't be able to know that money's ---- A risk argument, not that there was actual harm. Well, she was entitled to the document. And so, I mean, that is a concrete injury there. It brings up intangible harms that are harder to prove, that are less clear and obvious. But nonetheless, she was deprived of something, and money was taken out, so she might be entitled to get that money back under the actual damages provision. Absolutely. Does the statute say explicitly that any withdrawal that is made in violation of this statute is void? No. It says that a person is entitled to actual damages arising from a violation. I don't know the answer precisely to that question. All right. Why don't we hear from your adversary? Thank you. Thank you. Good morning, Your Honors. My name is David Hartzell, and along with my colleague Sarah Zielinski, we represent Portfolio Recovery Associates, LLC, in this matter. Let me start by clearing something up right off the bat. The confirmation letter was sent to her. It was sent. The timing here is important. We have the conversation on March 11th. That's the recorded conversation that's part of the record. And then six days later, on March 17th, she receives a confirmation letter setting forth the- You're saying she receives. Your adversary was saying that there was evidence in the record that one was sent, but not that she received it. What are you pointing to? I'm pointing to the joint appendix at 118. Well, first of all, the letter itself appears at the joint appendix at pages 42-45, and that letter was submitted by PRA as part of the briefing below. And the plaintiff's response in opposition to the motion to dismiss, and I'm pointing to appendix page 118, and if I could read this sentence to you, quote, instead defendant withdrew funds from plaintiff's account after it merely obtained plaintiff's oral agreement, and six days later, their emphasis, six days later, mailed her a payment schedule. So there's no dispute, I don't think, that the letter was sent or that it was received. Certainly that wasn't disputed below. But let me start from the beginning. The analysis, as you know, it always starts with two questions. What is the concrete interest that Congress intended to protect in Section 1693EA? That's easy. Congress intended to protect against unauthorized electric fund transfers. That's the concrete interest that's at issue here. The second question is, did the two procedural violations alleged here create or present a real risk of material harm to that concrete interest? And the answer, for all the reasons we've been discussing here, I think is clearly no. I'd like to talk with you about that, though, because I notice in your briefing you point to a later act that authorizes transactions to occur upon electronic signatures. But to me, that is a different consideration than this statute, which tries to protect consumers by requiring a writing at the time of the authorization, which to me suggests that Congress decided that a writing, requiring such a writing, is a way to ensure that consumers understand that they may have defenses, such as statute of limitations, as was available here, to a proposed debt collection activity. And so it seems to me that this is a clear violation of the statute, that the authorization that was obtained was not in writing. And the question is, did she run a risk enough to satisfy the Spokio standing requirement? So I wonder if you could comment on that approach. And would you agree that no writing, the initial authorization was not obtained in writing? Isn't that correct? No, I don't agree, Your Honor. Wasn't it obtained over the telephone? Yes. And for the purposes of the statute, for the purposes of Section 1692A3, when it talks about in writing, that requirement can be satisfied by the E-Sign Act, by taking the authorization over. When was the E-Sign Act passed? Subsequent to EFTA. Yeah. So when EFTA was originally passed, is it still your position that a phone call would be enough to satisfy the written authorization requirement? It's a good question, Your Honor. It's a good question. But I think certainly here, where the E-Sign Act is in play and clearly applies to any statute, to any situation where a writing or a signature is required, I think it's pretty clear that the E-Sign Act, Congress evidenced its belief that the use of a recorded voice signature in lieu of a hand-signed paper document did not create a material risk of harm to consumers. Why is that such an obvious conclusion? I mean, Congress has, in other statutes as well as in EFTA, evidenced special concern for consumers who are subject to debt collection activity and to bank transfers and needing to protect bank transfers from people doing foolish things. We have fraud that's rampant. It's not clear to me that the E-Sign Act was intended to address that kind of concern. Regulation E, which is the implementing regulation, specifically says that the in-writing requirement of Section 1692AE3 can be satisfied through the proper use of the E-Sign Act. The CFPB guidance also specifically says that a voice recording can satisfy the in-writing requirement. So you've got all of this authority lined up over here saying that this suffices to satisfy that in-writing requirement. And certainly that's how we operate here, that's how the entire industry operates, pursuant to the E-Sign Act, the Reg E, the CFPB guidance that governs it. So you're saying that the written authorization language is just totally superseded now by subsequent legislation? I wouldn't say superseded, Your Honor. I would say that it merely provides another form that the authorization can take to satisfy the in-writing requirement. Mr. Hersh? I'm sorry, Your Honor, if I could just finish. There's no question here that the authorization was provided. Nobody disputes that. They don't even dispute it. They plead in their complaint. Their complaint says she entered into an agreement, and pursuant to this agreement, she agreed to make monthly payments of $32.91 for the next 12 months. And she provided, as you pointed out, Your Honor, her bank routing account numbers, the bank routing numbers. They set up the payment schedule. She authorized the withdrawal of these funds from her credit union checking account. There's no allegation here that PRA violated any of those terms and conditions. There's no allegation here that we took the wrong amount of money or we took it on the wrong day or that we took it from the wrong account. So the only question here is, was the form of the authorization suffice? And did we meet the in-writing requirement? And our position is, pursuant to the E-Sign Act, yes, we did, and all the agency interpretations are the same. And that's a merits argument, am I right, the argument of the E-Sign Act? Well, it is, but I think it also goes to the standing issue, and I think that's why on a 12B1 motion you can have an evidentiary-type hearing, which we did not actually have a hearing, but evidence was submitted as part of the briefings. And may I ask you the question I asked Mr. McDevitt? Is there anything in the statute that says that a transaction that is entered in violation of these procedural requirements is void? I'm not aware of that, Your Honor. I don't believe there's anything in the statute that provides for that. Would it make a difference if it did? I'm going back to Mr. McDevitt's initial argument that there's clearly a case in controversy here. There's clearly harm because the money was taken out of somebody's account. It would seem to me that if you had a state statute, for example, that said a particular kind of consumer transaction must be entered in writing, and if it's not, the contract is void. Somehow, as part of that void contract, one provision was to allow a withdrawal such that money changed hands. I should think it odd to say that case could not be adjudicated in a federal court, if there was diversity, say, because there's no case or controversy, no concrete harm, if money was taken pursuant to a void contract, that state law prohibited that kind of taking of money. I guess all it boils down to is one of your answers to that argument, at least, would be, but this statute doesn't do that. It just provides for statutory damages if there is a violation of the procedural rules. Well, that's my understanding of the statute. It might be different under the circumstances you posit, but she certainly had the right, as you pointed out, Your Honor, to cancel it, all right? As far as the record reflects, she never did. There is nothing in the record to reflect that she did. My understanding is that payments were made. I think what's important, again, I go back to the sequence here, which is that you have the authorization being made over the telephone, followed six days later by this confirmation letter, which confirms all of the terms and conditions of the agreement. I don't recall the confirmation letter very specifically. Did it go into the details of her statute of limitations defense? That was referenced initially in the conversation very quickly by the individual who was speaking with Ms. Eakins. Where in the record is that? It's at pages 42-45, Your Honor. Thank you. It's actually three pages. The fourth page is a blank. Those are better at page 42. Yes. And that's a different issue. That's a requirement, particularly under New York law, requirement of the New York State Department of Financial Services to require this disclosure about whether there's a potential statute of limitations issue. That's with that first paragraph in there. That's a boilerplate disclosure. So that didn't reflect an actual fact that it had expired. It's just a boilerplate, you're saying. I don't believe so, Your Honor. Because that was something that struck me in the conversation, and that's something that could be cured by a satisfactory written authorization if there is a legitimate statute of limitations defense. Nothing prevents a consumer from paying, and nothing prevents us from asking somebody to pay a time bar debt. You simply can't threaten litigation or other judicial process over it. Statute of limitations extinguishes the remedy, not the right, if you will. So, yes, but in this letter you see — And it can get revived, the statute. It can get revived. I can't speak to what New York law is on that, sir. But it can under certain circumstances, but that's a very unique and individualized kind of question that's governed by state law. But you can see, and I know I'm out of time here, but if I could just finish this. Please go ahead and answer. If you could see in this letter at page 42, it says, write her name. After that disclosure, list letters to confirm your authorization of 3-11-2015. And then if you go to the back page, there's the whole payment schedule. So the first payment was not going to be until April 8th. This letter was sent on the 17th. So if there was some confusion, and by the way, there are no allegations of confusion in the complaint. There's no allegations, as I think Your Honor pointed out, that this consumer or any other consumer, consumers generally,  piece of paper. You're saying not a penny came out until the writing was received. Absolutely. And she had ample opportunity here. If she was confused, and Mr. McDermott said, I thought she thought. I thought she thought. I mean, it's kind of like double thought say. But if there was some real confusion on her part, or there was something incorrect about what was in this letter, she had three weeks to call us up and tell us or to cancel it. She didn't do that. She made the payments. So, Your Honor, we would ask that the judgment of the district court be affirmed. Thank you very much, Mr. McDermott. Thank you. Thank you. I just want to briefly respond to a couple points. One is the point about the letter. My opponent mentioned that we quoted that the PRA mailed her a payment schedule. I don't know that there's any concession in the record that she received the payment schedule or that she received it. Is there a presumption that if something is mailed, it's received? Well, there may be. But whether or not she received it within the amount of time is certainly different. There's a chance she didn't read it. So in the audio recording, a collection associate says, be on the lookout for these because these tend to look like junk mail. The amount of time. Well, what I'm saying is it's not about the amount of time. It's about the fact that the consumer is involved in an interaction with the person. And rather than getting the thing right there so they can. The consumer is involved with an interaction with the piece of paper. And the piece of paper came before any money was taken out. What else does the statute require? It requires that the authorization be given to them when the authorization is made. And that didn't happen here. And the agent. Your argument was that there's a requirement of a written authorization, and she didn't do that. There are two things. She's supposed to get a writing, and then she's also supposed to authorize in writing. So the statute says an electronic fund transfer from a consumer's account may be authorized by the consumer only in writing. And a copy of such authorization, meaning such written authorization, shall be provided to the consumer when made. So in addition to the fact that she's supposed to authorize it in writing, meaning sign it, that's what the agency interpretation is, means there needs to be a signature. She's also supposed to get a copy of that written authorization with her signature on it so she can go back to it. She didn't get a copy of it. But, I mean, you're not saying that the statute would prohibit a telephone conversation followed by a letter that says, here's what you agreed to. Sign a copy and return it to us. Of course not. Right. That would be okay. Absolutely. And it's not a matter of then they would have to it still wouldn't be valid until they sent her back a Xerox copy of it with her signature on it. No, of course not. The thing that you're really complaining about is that maybe she got notice of what she orally agreed to, and that may be a perfectly fine notice, but your argument is that nothing is effective under the statute unless she signs in writing and the company gets a signed authorization. They can't go to the bank and take money out unless they get a signed authorization from her. That's your argument, right? Yes, Your Honor. And we argued in the district court below that an authorization that does not comply with AFTA's 1693 EA is no authorization at all. And so you'd ask the question about whether there was a provision that says any such contract is void. Well, I would say that this very provision says the electronic fund transfer, it says a preauthorized electronic fund transfer may be authorized by the consumer only in writing. That's essentially saying, well, it might meet the definition. The definition is preauthorized. It's essentially not authorized. You can't do a preauthorized electronic fund transfer unless you get the consumer's written authorization and give them a copy of it. And unless you do both of those things, then the authorization is basically no longer authorized, and therefore they're entitled to their money back. And at the very least, we have that argument. I just wanted to say, in case you missed it, that the audio recording, the collection agent concedes that their documents they send look like junk mail and says, be on the lookout, don't miss it, because it looks like junk mail and you might not see the letter we send you. And so there is a very big difference between sending a letter many, many days later and giving it to them at the time the authorization is made. With respect to the e-sign act, there is an example of no good deed goes unpunished. They're going to be in worse shape because they told her to specifically watch out for the thing coming in the mail because it is coming and you should look for it, and that makes it worse? Well, it's record evidence of a serious risk that the person will not actually get the document that Congress intended them to get. And so the cards lay where they do. With respect to the e-sign act, the e-sign act has a specific carve-out for consumer statutes, and in that says a recording of an oral communication shall not constitute an electronic record for the purposes of this subsection. So I don't think the e-sign act will help the appellee in this matter. But, again, that's a merits issue. It wasn't addressed in the court below. And unless you have any other questions, I think that's all I wanted to say. Thank you very much. We have two cases on submission today, United States v. Tukes and Carney v. Jibo. But that concludes our argument this morning. The clerk will adjourn court, please. Thank you.